529 A.2d 1372

John R. HARGROVE

v.

BOARD OF TRUSTEES OF the MARYLAND RETIREMENT SYSTEM.

No. 119, Sept. Term, 1985.

Court of Appeals of Maryland.

Sept. 2, 1987.

M. Albert Figinski (Ethan L. Bauman, on brief), Baltimore, for appellant.

Ralph S. Tyler, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SMITH,* ELDRIDGE, COLE, RODOWSKY, COUCH* and McAULIFFE, JJ.

ELDRIDGE, Judge.

Maryland Code (1957, 1983 Repl.Vol.), Art. 73B, § 56(c)(1), provides that a retired state judge who accepts employment in which all or part of the compensation comes from governmental funds will have his state pension benefits reduced to the extent that his compensation from the employment plus his judicial pension benefits exceeds the current salary of an active state judge at the same level. This case presents a challenge to the constitutionality of § 56(c)(1) under equal protection and substantive due process principles.

---

* SMITH, J., and COUCH, J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participated in the decision and adoption of this opinion.

## I.

The current Judicial Pension Plan is one of several retirement plans for state officials and employees.[1] A judge becomes vested in this plan upon accession to the bench, and is required to contribute 6% of his annual compensation to the pension fund for a maximum of 16 years. Under the plan, the annual pension payable to a retired judge is "two thirds of the salary payable in that fiscal year to a judge holding the same or same level judicial position as that in which the former judge served at the time of" retirement. Art. 73B, § 57(h).

Section 56(c)(1) of Article 73B contains the provision of the Judicial Pension Plan which is under attack in this case. The subsection provides as follows:

"(c)(1) Except as provided in paragraph (2) of this subsection, a retired judge eligible for benefits under this subtitle may accept employment in which all or part of the compensation for the employment comes from municipal, county, State, or federal funds, if he immediately notifies the board of trustees of the Employees' Retirement System of his intention to accept the employment and specifies the compensation to be received for the employment. The annual retirement allowance receivable by the former judge plus the annual compensation for the position may not exceed in amount the compensation upon which the retirement allowance is based. During any period in which the total of the annual retirement allowance and the annual compensation for the position in fact exceeds the compensation upon which the retirement allowance is based, the retirement allowance shall be reduced by that amount necessary to bring the former judge's total compensation within the limit specified in

---

**1.** The current Judicial Pension Plan is sometimes called the "contributory plan," and it is the plan in effect for all Maryland judges appointed or elected in recent years. It is the plan with which this case is concerned. An older, noncontributory plan, is also dealt with in the Code. *See* Maryland Code (1957, 1983 Repl. Vol.), Art. 73B, §§ 55(b), 55(h), 57, 58.

this subsection. If a retired judge accepts employment in accordance with this subsection and is subsequently awarded retirement benefits as a result of that employment, his retirement benefits under this subtitle shall be reduced in the amount of the retirement benefits resulting from the subsequent employment."

Under this subsection, a retired judge may accept local, state or federal governmental employment. Before his pension benefits are affected, he is entitled to receive from the public employment the difference between his plan benefits and the compensation on which his plan benefits are based. When a retired judge's total income from his public employment and pension benefits exceeds the compensation on which the pension benefits are based, there is a dollar-for-dollar offset of pension benefits for each additional dollar of public employment salary.

Under the pension plans applicable to most other retired state government employees,[2] acceptance of permanent state government employment or certain local government employment results in a complete loss of state pension benefits; there is not simply an offset. *See, e.g.*, Art. 73B, § 11(15)(b) (state employees retirement system); Art. 73B, § 86(9)(b) (teachers' retirement system). Nevertheless, federal government employment does not result in a pension loss or offset for nonjudicial state government retirees. Among retired state employees, it is only retired state judges whose pensions are offset by government employment, including federal government employment. Consequently, as to the effect of government employment on pension benefits, retired state judges are treated better than other retired state employees with regard to local and state government employment (offset as opposed to a complete loss) and are treated worse than other retired state

---

**2.** There are several different retirement plans applicable to State employees in Maryland. *See, e.g.*, Art. 73B, § 1 *et seq.* (employees retirement system); Art. 73B, § 81 *et seq.* (teachers' retirement system); Art. 73B, § 158 (listing eight different plans).

employees with regard to federal government employment (offset as opposed to no effect).

## II.

The offset provisions of the Judicial Pension Plan, Art. 73B, § 56(c)(1), are challenged in this case by John Hargrove, a judge of the United States District Court for the District of Maryland. Judge Hargrove's state judicial service began in February 1962 when he was appointed judge of the People's Court of Baltimore City.[3] After a short hiatus from the bench, Judge Hargrove was appointed to the Municipal Court of Baltimore City in March 1968, which was incorporated three years later into the District Court of Maryland. In July 1974, Judge Hargrove was appointed to the Supreme Bench of Baltimore City, redesignated in 1983 the Circuit Court for Baltimore City.

On February 17, 1984, Judge Hargrove retired from the Circuit Court for Baltimore City to accept an appointment as judge of the United States District Court for the District of Maryland. Judge Hargrove's tenure on the federal bench commenced February 18, 1984, and presently continues.

There is no dispute that on the date of his retirement from the Circuit Court for Baltimore City, Judge Hargrove had accrued sufficient years of membership service and contribution, and had attained the requisite age, to qualify immediately upon retirement for an annual pension equal to two-thirds of the annual salary of an active circuit court

---

**3.** When Judge Hargrove enrolled in the Judicial Pension Plan in 1962, a retired state judge could not receive his judicial pension as long as he held any "salaried public office or position, municipal, county, State or federal." Code (1957), Art. 26, § 49. In 1976, while Judge Hargrove was still on the state bench, this restriction was liberalized "[f]or the purpose of permitting a retired judge to accept salaried employment or office without loss of retirement benefits, subject to certain limitations and conditions." Ch. 501 of the Acts of 1976. The formula detailed in § 56(c)(1) was enacted in 1976 and has remained unchanged.

judge.[4] The Board of Trustees of the Maryland Retirement System, however, has refused to pay Judge Hargrove any pension benefits, as his federal salary ($78,700) plus his pension benefits ($42,000) exceed the compensation on which his pension benefits are based ($65,900).[5] Therefore, application of the formula in § 56(c)(1) results in a complete offset so that Judge Hargrove receives no state pension benefits.

Consequently, on behalf of Judge Hargrove, the Maryland Administrative Office of the Courts sought an opinion from the Maryland Attorney General concerning Judge Hargrove's rights under the Judicial Pension Plan. Specifically, the Attorney General was asked to address whether Art. 73B, § 56(c)(1), applies to a retired state judge who becomes a federal judge, and if so, whether § 56(c)(1) deprives a retired judge of equal protection of the laws. The Attorney General responded with an opinion concluding that "the language of § 56(c)(1) unambiguously applies to any form of public employment, including federal judgeships." Opinion No. 84–025 at 151 (Oct. 3, 1984). Analyzing the equal protection issue, the Attorney General applied the "rational basis test" and determined that the reduction in pension benefits was rationally related to the goal of avoiding "double dipping" into public funds. *Id.* at 156.[6]

---

4. Upon his retirement from the state bench or within six months thereafter Judge Hargrove was also entitled to withdraw his contributions to the fund ($12,888.85) in a lump sum plus interest. Code (1957, 1983 Repl. Vol.), Art. 73B, § 57(k). Judge Hargrove opted not to withdraw from the pension plan.

5. These figures were taken from the parties' briefs, may be mere approximations, and may be somewhat outdated. Any variance between these approximations and the actual figures has no impact on the issues presented in this case.

6. The Attorney General also determined that § 56(c)(1) was not invalid on the grounds that it: "(1) prevents a retired judge from pursuing his profession; (2) was beyond the authority of the General Assembly to enact; (3) deprives a retired judge of a vested property right; ... or (5) restricts a retired judge's right to receive deferred compensation." *Id.* at 149.

The Attorney General further stated that there was a rational basis for the distinction between retired state judges who accept federal employment and other state retirees who accept federal employment. The Attorney General noted that the Judicial Pension Plan significantly differed from other state retirement plans. The Attorney General was of the view that "the General Assembly could rationally have concluded that the differences between the 'double dipping' provisions applicable to State judges and those applicable to other State employees are appropriate to the two groups' different situations, given especially the substantial differences in their underlying benefits." *Id.* at 157.

Subsequently, Judge Hargrove filed a complaint for declaratory judgment in the Circuit Court for Baltimore City. Judge Hargrove contended that § 56(c)(1) "significantly interferes with and infringes upon the right of retired state judges to engage in their chosen calling, by causing retired state judges to lose certain vested pension benefits if they accept employment compensated by municipal, county, state or federal funds." Judge Hargrove also alleged that the Judicial Pension Plan, as the only state pension plan providing for a reduction of benefits when the retiree accepts employment compensated by federal funds, "discriminates ... between the class of state retirees made up of persons who served as judges during their period of state employment and the class of state retirees who did not serve as judges during their period of state employment." Judge Hargrove asserted that the Board's failure to pay him any of his vested pension benefits violated his rights to equal protection of the laws and due process of the law. He relied on both Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment to the federal constitution.[7]

---

7. Prior to oral argument in this Court, it was unclear whether Judge Hargrove was relying on the federal constitution as well as the state

Both Judge Hargrove and the Board filed motions for summary judgment. In a written opinion and order, the Circuit Court for Baltimore City (DeWaters, J., specially assigned) granted the Board's motion for summary judgment. The court stated that the purpose of § 56(c)(1) was to protect "against double dipping while allowing public employment." The court concluded that the formula in § 56(c)(1), "based on the amount of pension, the amount of compensation from public employment and the salary of an active state judge," was a reasonable balance between the prevention of double dipping and the "utilization in the public sector of competent retired state judges." The court, relying on *Clark v. Tawes*, 187 Md. 195, 49 A.2d 463 (1946), rejected a requirement "that all state employees be treated alike by the legislature when pension bills are passed." The court also rejected Judge Hargrove's due process contention.

Judge Hargrove took an appeal to the Court of Special Appeals. Before briefing and argument in that court, we issued a writ of certiorari to address the important matter presented. We shall affirm.

### III.

The distinctive feature of § 56(c)(1) giving rise to Judge Hargrove's constitutional challenge is that retired state judges are the only class of state retirees whose pensions are offset upon accepting post-retirement federal employment. The Board has advanced several legislative purposes for this classification. Specifically, the Board maintains that the purposes of § 56(c)(1) are to prevent the appearance of impropriety, to prevent double dipping, and to encourage state judges to remain on the bench rather than accept more lucrative public employment.

Relying upon our opinion in *Attorney General v. Waldron*, 289 Md. 683, 426 A.2d 929 (1981), Judge Hargrove

---

constitution. At oral argument counsel for Judge Hargrove made it clear that he was relying on both constitutions.

urges this Court to apply "heightened scrutiny" when reviewing § 56(c)(1). Quoting from *Waldron* and from *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 458 A.2d 758 (1983), Judge Hargrove states (Appellant's brief, pp. 13–14):

" 'Heightened scrutiny' requires that a classification bear a 'fair and substantial relation' to the purpose of the legislation, *Waldron II*, 289 Md. at 709–10 [426 A.2d 929], 'so that all persons similarly situated and circumstanced will be treated alike.' *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 642 [458 A.2d 758] (1983). Sheer speculation as to the legislature's purposes, and *post hoc* rationalizations offered in support of the statute, are not entitled to weight by the court. *Waldron II*, 289 Md. at 724 [426 A.2d 929]. Moreover, 'a loose fit betweeen the legislative end and the means chosen to accomplish these goals, which leaves a significant measure of similarly situated persons unaffected by the enactment, or conversely, which includes individuals within the statute's purview who are not afflicted with the evil the statute seeks to remedy, is intolerable.' *Id.* at 713–14 [426 A.2d 929]. Therefore, 'this level of review does not tolerate random speculation concerning possible justification for a challenged enactment....' *Hornbeck*, 295 Md. at 642 [458 A.2d 758]."

Judge Hargrove maintains that, under the "heightened scrutiny" standard, "the unequal treatment between retired judges and all other state retirees is utterly without rational foundation and certainly does not bear any fair and substantial relation to the purposes of the law." (Appellant's brief, p. 14). He argues that there is "no substantial justification for the disparate treatment" of retired judges and other state retirees, that the policy against double dipping "applies equally to retired judges and to non-judicial state retirees," that the rationale of encouragement to remain in state service is equally applicable to "any non-judicial retiree who accepts a more lucrative federal job," and that the "appearance of impropriety" argument, if valid at

all, applies as well to non-judicial state retirees. (*Id.* at pp. 16–17, 22–27). Judge Hargrove contends that, under a "heightened scrutiny" analysis, the fact "that the State retirement plans may contain terms and conditions which are different as between various plans" does not justify the discrepancy in treatment between "retirees [who] are similarly situated." (*Id.* at 17).

*Attorney General v. Waldron, supra,* 289 Md. 683, 426 A.2d 929, involved a constitutional challenge on equal protection grounds to a Maryland statutory provision which prohibited a retired judge, who was receiving his pension, from practicing law. The statute did not merely condition the continued receipt of pension benefits on refraining from the practice of law; instead, it was a direct outright prohibition upon the practice of law by a pensioned judge. No other retired state lawyer, official or employee was similarly prohibited from pursuing his or her occupation. This Court in *Waldron* pointed out that the equal protection concept embodied in Article 24 of the Maryland Declaration of Rights and the Fourteenth Amendment's Equal Protection Clause, while "independent [and] capable of divergent effect," generally mean the same and apply in like manner. 289 Md. at 705–705, 426 A.2d 929. We reiterated that " 'decisions of the Supreme Court on the Fourteenth Amendment are practically direct authorities' " with respect to Article 24 of the Declaration of Rights. *Id.* at 705, 426 A.2d 929, quoting from *Bureau of Mines v. George's Creek,* 272 Md. 143, 156, 321 A.2d 748, 755 (1974).

The Court in *Waldron* then discussed the appropriate standards for reviewing distinctions or classifications under equal protection principles. Judge Digges for the Court initially pointed out that a limited number of distinctions are subject to "strict scrutiny," saying (289 Md. at 705–706, 426 A.2d 929):

"The top tier of this review contemplates that when a statute creates a distinction based upon clearly 'suspect' criteria, or when that enactment infringes upon personal rights or interests deemed to be 'fundamental,' then the

legislative product must withstand a rigorous, 'strict scrutiny.' Laws which are subject to this demanding review violate the equal protection clause 'unless the State can demonstrate that such laws are *"necessary* to promote a *compelling* governmental interest."' *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995 [1003], 31 L.Ed.2d 274 (1972) (quoting *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322 [1331], 22 L.Ed.2d 600 (1969) (emphasis in original)."

After reviewing several of the classifications subject to strict scrutiny because they fall in the "suspect" category (*e.g.,* race, national origin, ancestry) or affect rights which have been deemed "fundamental" (*e.g.,* First Amendment rights, right to vote, right to interstate travel, etc.), the Court in *Waldron* turned to "traditional equal protection analysis" utilizing the rational basis test (*id.* at 706–707, 426 A.2d 929):

"If, on the other hand, neither a suspect class nor a fundamental right or interest is implicated, then the traditional equal protection analysis calls forth a much less demanding standard of review under the second tier—the 'rational basis' test. Using this approach, a statutory classification is struck down, in the oft-expressed words of the Supreme Court, only if the means chosen by the legislative body are 'wholly irrelevant to the achievement of the State's objective.' *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101 [1105], 6 L.Ed.2d 393 (1961); *McDonald v. Board of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404 [1408], 22 L.Ed.2d 739 (1969). The Supreme Court, in applying this test, has been willing to uphold the constitutionality of an enactment when 'any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland, supra* at 426 [81 S.Ct. at 1105]. See *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978); *Kotch v. Pilot Comm'rs,* 330 U.S. 552, 67 S.Ct. 910, 91 L.Ed. 1093 (1947). This deferential review of state legislative classifications operates, at least in the sphere of economic regulation, 'quite apart

from whether the conceivable "state of facts" (1) actually exists, (2) would convincingly justify the classification if it did exist, or (3) has ever been urged in the classification's defense by those who either promulgated it or have argued in its support.' L. Tribe, *American Constitutional Law* § 16–3, p. 996 (1978) (hereinafter cited as Tribe). See, *e.g., Minnesota v. Clover Leaf Creamery Company* [449], U.S. [456], 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *U.S. Railroad Retirement Bd. v. Fritz* [449], U.S. [166], 101 S.Ct. 453, 66 L.Ed.2d 368 (1980); *McDonald v. Board of Election, supra; Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 528–29, 79 S.Ct. 437 [441–42], 3 L.Ed.2d 480 (1959); *Kotch v. Pilot Comm'rs, supra; Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911)."

Next, the *Waldron* opinion observed that there were some classifications which have not been deemed to be suspect or to affect fundamental rights and thus have not been subjected to the "strict scrutiny" test, but which have also not been examined under the most deferential "rational basis" principles. After discussing several cases, Judge Digges described these classifications as giving rise to a "heightened scrutiny," saying (289 Md. at 711–712, 426 A.2d 929):

"These cases apparently fall within two general categories which, not surprisingly, parallel the two groupings that trigger application of the strict scrutiny test. First are those enactments which impact upon 'sensitive, although not necessarily suspect criteria of classification.' *Tribe* at 1090. To date, this group clearly encompasses gender discriminations, *e.g., Caban v. Mohammed,* 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); *Craig v. Boren, supra,* [429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) ], and probably includes those classifications based on illegitimacy. See *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). The second category of statutes which activate heightened scrutiny are those which affect 'important' personal inter-

ests or work a 'significant interference with liberty or a denial of a benefit vital to the individual.' *Tribe* at 1090. Professor Tribe's amorphous characterization of this category derives from an analysis of decisions which share that quality. We find *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), typical of this genus, where an amendment to the federal food stamp program which denied the stamps to households comprised of unrelated members was held irrational despite government assertions that the provision helped to prevent fraud. See also *Eisenstadt v. Baird, supra* [405 U.S. 438, 447, 92 S.Ct. 1029, 1035, 31 L.Ed.2d 349 (1972)]; *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102–03, 96 S.Ct. 1895 [1905], 48 L.Ed.2d 495 (1976) (alien's 'ineligibility for employment in a major sector of the economy' characterized as 'deprivation of an interest in liberty' and warranting 'some judicial scrutiny'). *See Vlandis v. Kline*, 412 U.S. 441, 459, 93 S.Ct. 2230 [2240], 37 L.Ed.2d 63 (1973) (White, J., concurring) (denial of reduced tuition to out-of-state students who became residents interfered with 'interest ... [in] obtaining a higher education')."

Judge Digges went on for the Court (*id.* at 713, 426 A.2d 929):

"[W]hen important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord, are affected by a legislative classification, a court should engage in a review consonant with the importance of the personal right involved. This latter judicial inquiry does not tolerate random speculation concerning possible justifications for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means chosen to effectuate that purpose."

The Court in *Waldron* concluded that the statutory classification involved in that case was subject to "heightened scrutiny," as the prohibition upon the practice of law by judicial pensioners "flatly denies one the right to engage in

the practice of the profession for which he is otherwise qualified." 289 Md. at 717, 426 A.2d 929. The Court, after reviewing the proffered justifications for the statutory discrimination, held that the statute violated the Equal Protection Clause of the Fourteenth Amendment and the equal protection principle embodied in Article 24 of the Declaration of Rights. It was pointed out that the statute made a classification which bore no relationship to the claimed legislative goal of preventing impropriety, that the classification was underinclusive in that it omitted some persons who should have been subjected to the regulation in order to attain the stated legislative purpose (other retired state lawyers were permitted to practice law for compensation), and that the statute permitted retired judges to practice law if they did so without compensation. For more recent cases applying the equal protection principles reviewed in *Waldron, see, e.g., United Wire v. State Deposit Ins. Fund,* 307 Md. 148, 157–161, 512 A.2d 1047 (1986); *Broadwater v. State,* 306 Md. 597, 606–608, 510 A.2d 583 (1986); *Ennis v. State,* 306 Md. 579, 591, 594–597, 510 A.2d 573 (1986); *State v. Wyand,* 304 Md. 721, 726–730, 501 A.2d 43 (1985), *cert. denied,* 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 893 (1986); *Whiting-Turner Contracting Co. v. Coupard,* 304 Md. 340, 350–358, 499 A.2d 178 (1985); *Department of Transportation v. Armacost,* 299 Md. 392, 408–414, 474 A.2d 191 (1984); *State v. Good Samaritan Hospital,* 299 Md. 310, 326–329, 473 A.2d 892, *appeal dismissed,* 469 U.S. 802, 105 S.Ct. 56, 83 L.Ed.2d 7 (1984); *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. at 640–657, 458 A.2d 758. *See also Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), for a recent Supreme Court discussion of the matter.

Turning to the present case, Judge Hargrove does not argue that Art. 73B, § 56(c)(1), involves a suspect classification or a fundamental right. Thus, the statute is concededly not subject to the strict scrutiny test. The principal thrust of Judge Hargrove's argument is that the pension offset provision of § 56(c)(1) significantly interferes with his right to pursue his chosen calling as a federal judge, and

that, therefore, the provision is subject to a "heightened scrutiny." He equates § 56(c)(1) with the statute invalidated in *Waldron,* and argues that the *Waldron* case compels the invalidation of § 56(c)(1). We disagree.

■ Unlike the provision challenged in *Waldron,* § 56(c)(1) does not prohibit a retired state judge, such as Judge Hargrove, from practicing law, accepting a position as a government attorney, or accepting a federal judgeship. Instead, § 56(c)(1) explicitly recognizes the right of a retired judge to accept public employment after retirement: "a retired judge eligible for benefits under this subtitle *may accept employment* in which all or part of the compensation for the employment comes from municipal, county, State or federal funds ... (emphasis added)." This is clearly distinguishable from the statute invalidated in *Waldron,* which provided that "a judge who retires and accepts the pension provided by this subtitle *may not, thereafter, engage in the practice of law for compensation." See* Code (1957, 1978 Repl.Vol.), Art. 73B § 56(c) (emphasis added).

Instead of operating as a prohibition upon the pursuit of a chosen calling, § 56(c)(1) operates as a limitation upon the amount of a judicial pension to be received; in order to receive a full judicial pension, a retired judge may not earn from public employment an amount that exceeds the difference between his pension benefits and the salary upon which his benefits are based. This distinction was expressly recognized and relied on in *Waldron,* 289 Md. at 723, 426 A.2d 929, where we noted that the statute there at issue

"prohibits the practice of law for compensation by a former judge who accepts his pension. By its very terms, it does not reduce benefits in proportion to the judge's outside income, nor is receipt of the pension conditioned on a judge refraining from engaging in his chosen profession."

We pointed out (*id.* at 716, 426 A.2d 929):

"The [challenged] statute does not establish a precondition for receipt of the pension; rather, it flatly prohibits

this group of state pensioners from engaging in their profession for pay." [8]

Furthermore, the practical effect of § 56(c)(1) is unlike the effect of the statute invalidated in *Waldron*. In *Waldron*, the statute compelled a retired judge to choose between receiving his pension and practicing his chosen occupation. Section 56(c)(1) does not require such an "either or" choice. After his retirement, Judge Hargrove was free to enter private practice and receive his full pension. He was also free to earn from public employment the difference between his pension and the salary upon which it was based, without any reduction in pension benefits. Finally, Judge Hargrove was free to accept public employment at a higher salary and receive his offset pension.

The differences between § 56(c)(1) and the statute involved in *Waldron* are obvious and compelling. Section 56(c)(1) does not infringe upon a retired judge's right to pursue his occupation or upon any similar personal right. Instead, it merely regulates the amount of pension benefits upon certain contingencies. For these reasons, we hold that a "heightened scrutiny" standard is not applicable here, and that § 56(c)(1) should be reviewed under traditional and deferential rational basis principles. *See Jackson Firefighters Ass'n v. City of Jackson*, 736 F.2d 209 (5th Cir. 1984) (rational basis test used to determine validity of disparate treatment under municipal retirement plans); *In re Marriage of Alarcon*, 149 Cal.App.3d 544, 196 Cal.Rptr. 887 (1983) (rational basis test applied to determine validity of judicial pension statute that reduced benefits by amount of salary as a federal judge); *Allen v. State*, 100 Nev. 130, 676 P.2d 792 (1984) (rational basis test applied to uphold statute that raises benefits for future, and not present, retirees); *Reiser v. Pension Com'n of Emp. Retirement*

---

**8.** *See also Chairman of Board v. Waldron*, 285 Md. 175, 180–181, 401 A.2d 172 (1979), where we distinguished former § 56(c) from its predecessor. The predecessor statute merely conditioned the receipt of a judicial pension, and did not prohibit a pensioned judge from engaging in the practice of law for compensation.

*System,* 147 N.J.Super. 168, 370 A.2d 902 (1976) (rational basis test applied to determine validity of pension statute that provided different standards for awarding widow's benefits); *Automobile, Etc. v. Department of Retirement,* 92 Wash.2d 415, 598 P.2d 379 (1979), *appeal dismissed,* 444 U.S. 1040, 100 S.Ct. 724, 62 L.Ed.2d 726 (1980) (rational basis test applied to determine validity of excluding port police from law enforcement officers' retirement system).

As recently pointed out by Judge Rodowsky for the Court in *Whiting-Turner Contracting Co. v. Coupard, supra,* 304 Md. at 352, 499 A.2d 178, under such a rational basis test, a statutory classification

"enjoys a strong presumption of constitutionality, [and] can be invalidated only if the classification is without any reasonable basis and is purely arbitrary. Further, a classification having some reasonable basis need not be made with mathematical nicety and may result in some inequality. If any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time the law was enacted must be assumed."

*See, e.g., Broadwater v. State, supra,* 306 Md. at 607, 510 A.2d 583; *Ennis v. State, supra,* 306 Md. at 595, 510 A.2d 573; *State v. Wyand, supra,* 304 Md. at 727–728, 501 A.2d 43; *Hornbeck v. Somerset Co. Bd. of Educ., supra,* 295 Md. at 642, 458 A.2d 758; *Neville v. State,* 290 Md. 364, 383, 430 A.2d 570 (1981); *Governor v. Exxon Corp.,* 279 Md. 410, 439, 370 A.2d 1102 (1977), *aff'd,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Bowie Inn v. City of Bowie,* 274 Md. 230, 241, 335 A.2d 679 (1975).

In our view, Judge Hargrove has not demonstrated the total lack of any rational basis underlying § 56(c)(1). Some legislators may have considered it problematic that judges might be wooed from the state bench by offers of federal employment. Similarly, some legislators may not have considered as problematic the number of nonjudicial state employees retiring in order to pursue federal employment. It is properly within the judgment of the General

Assembly to determine what incentives may be needed to retain state judges. One reasonable incentive is to offset a judicial pension by the amount of federal salary received by a retired judge when his total income exceeds the amount of salary he would have received had he stayed on the State bench. We are unable to say that § 56(c)(1) of the Judicial Pension Plan, as the only state employee pension plan to reduce pension benefits upon post retirement federal employment, has utterly no reasonable relation to the possible legislative goal of encouraging judges to remain on the state bench rather than accept federal employment.

There may be some merit in Judge Hargrove's criticisms of this or other possible legislative purposes underlying the difference in treatment between retired state judges accepting federal government employment and other retired state employees accepting such employment. Nonetheless, it is not our province to determine the fairness or desirability of legislative classifications. *See Hornbeck v. Somerset Co. Bd. of Educ., supra*, 295 Md. at 658, 458 A.2d 758. As Chief Judge Murphy stated for the Court in *Department of Transportation v. Armacost, supra*, 299 Md. at 413, 474 A.2d 191, "[w]e need not be convinced that the reasons for the distinctions are good ones; that is a question for the legislature. Rather, we need only find that there is some rational relationship between the legislature's goal and the means chosen to achieve it."

■ Moreover, not all variances among different pension systems need be justified by the State. This was pointed out by the Court in *Clark v. Tawes, supra*, 187 Md. at 200, 49 A.2d 463: "The class of statutes usually known as retirement acts which provide pensions for different classes of State employees need not be alike as to all employees." The Judicial Pension Plan for retired Maryland judges contains some advantages not found in other plans. For example, as previously mentioned, retired judges may accept permanent post-retirement employment at the state and local level, subject only to an offset, while other retired state employees will lose their pension benefit if they accept

certain such permanent employment. The Judicial Pension Plan has the shortest vesting period (*i.e.*, none at all, as vesting is immediate upon accession to the bench), one of the earliest retirement ages, one of the highest benefit levels, and is among the most generous in providing survivor and disability benefits. As the various state pension plans have evolved with many amendments to one or another over the years, each one is different from the others. In some respects the Judicial Pension Plan is superior to the others and in some respects inferior. These discrepancies do not invalidate the plan on constitutional grounds. *See U.S.R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 177, 101 S.Ct. 453, 460, 66 L.Ed.2d 368 (1980) ("Because Congress could have eliminated windfall benefits for all classes of employees, it is not constitutionally impermissible for Congress to have drawn lines between groups of employees for the purpose of phasing out those benefits"); *Jackson Firefighters Ass'n v. City of Jackson, supra*, 736 F.2d at 210 ("The equal protection clause does not require that all public employees whenever employed receive the same pension ... benefits").

## IV.

While Judge Hargrove did not advance this argument, the dissenting opinion suggests that § 56(c)(1) is unconstitutional because it may deter qualified state judges from accepting appointments to the federal bench. The dissent attempts to illustrate this proposition through an analogy to the Supreme Court's ballot access cases.

The ballot access cases hold that the right to run for elective office is important although not fundamental, *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). Therefore, the Equal Protection Clause of the Fourteenth Amendment prohibits the states from restricting ballot access through "invidiously discriminatory classifications," *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970), from imposing excessive filing fees upon candidates for elective office, *Bullock*

*v. Carter, supra,* 405 U.S. at 143–144, 92 S.Ct. at 856, or from providing that political parties meet very restrictive requirements before they may be placed on ballots, *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). *See also Jenness v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971).

The ballot access cases are largely grounded in the principle that, by diminishing the number of choices available to voters, burdensome restrictions upon the pool of candidates impair the fundamental right to vote. Therefore, as the dissent appears to recognize, the constitutional right to be a candidate for elective office is a corollary of the constitutional protection of the elective franchise. It is unclear why the ballot access cases should be relevant at all in a case, such as this one, involving an asserted "restriction" upon the ability to accept an appointed position—a federal judgeship. Voters have no opportunity to pass upon the qualifications of candidates for the federal bench; therefore, even if § 56(c)(1) did in fact deter some qualified state judges from accepting appointments to the federal bench, it would not diminish the number of choices available to voters. Hence, the ballot access cases are simply irrelevant.

Moreover, § 56(c)(1) could not logically be a financial deterrent keeping state judges from accepting appointments to the federal bench. Whenever federal judicial salaries are greater than the salaries of Maryland judges, as is currently the case, a state judge will benefit financially by accepting an appointment to the federal bench. But, in the event that the General Assembly were to raise state judges' salaries to a level greater than that in the federal judiciary, there would be no financial disincentive for a state judge, eligible to retire at full pension, to retire and accept a federal judicial appointment. Under § 56(c)(1), the former state judge's pension benefits would only be offset to the extent that his federal salary plus his pension benefits would exceed the compensation on which his pension benefits are based—a state judge's salary. Finally, even if a former state judge's pension benefits are partially or

completely offset because of his current federal salary, the judge, by accepting subsequent public employment, does not forfeit his entitlement to state pension benefits. Instead, the receipt of full state pension benefits is simply deferred until the judge's ultimate retirement from public service. At that point, he will receive both his full state pension and any federal pension to which he is entitled. Consequently, it is implausible to suggest that § 56(c)(1) is a financial deterrent that might keep qualified state judges from accepting appointments to the federal bench.

## V.

Finally, Judge Hargrove contends that Art. 73B, § 56(c)(1), is invalid under the due process guarantees of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights. He alleges that the "federal offset is irrational in and of itself, regardless to whom it is applied," and therefore it violates his "right to substantive due process." (Appellant's Brief, p. 36).

A statute such as § 56(c)(1) will not be held to violate due process guarantees unless the act "is shown to be arbitrary, oppressive or unreasonable.... Moreover, the wisdom or expediency of [the] law ... is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported." *Westchester West No. 2 v. Mont. Co.,* 276 Md. 448, 455, 348 A.2d 856 (1975). For the reasons set forth in Parts III and IV above, § 56(c)(1) is not invalid under this test.

JUDGMENT AFFIRMED, WITH COSTS.

McAULIFFE, J., dissents.

McAULIFFE, Judge, dissenting.

I agree that this case is not directly analogous to *Waldron* [1], but I believe that this statutory deprivation of

---

1. *Attorney General v. Waldron,* 289 Md. 683, 426 A.2d 929 (1981).

earned compensation cannot survive a proper equal protection analysis. My disagreement with the majority is twofold. First, I do not accept the restrictive approach requiring that all cases be divided into one of three classifications for determination of the level of scrutiny to be applied without any consideration of the range of difference that may exist in the fact situations of cases within a single classification. Second, I believe the majority has adopted too narrow a focus with respect to the important rights affected by this legislation, restricting its consideration to the impact upon judges and failing to consider as well the impact upon the federal judicial system and the rights of the people as a whole.

On the first point, there was a time not so long ago when the equal protection analysis employed only two categories of cases: 1) those involving "fundamental" personal rights or involving distinctions based upon clearly "suspect" criteria and, 2) all other cases. Cases falling into the first category were said to be entitled to the demanding review of "strict scrutiny" while those failing to make that category were relegated to a "rational basis" test. *Waldron, supra*, 289 Md. at 705–07, 426 A.2d 929. As Judge J. Dudley Digges pointed out for the court in *Waldron*, the practical result of this rigid two-tier analysis was that the determination of the classification in large measure dictated the outcome of the cases. Legislation in cases in the first category was nearly always struck down under an analysis that is "strict in theory and fatal in fact," and legislation in other cases almost invariably survived, receiving "minimal scrutiny in theory and virtually none in fact." *Waldron, supra*, 289 Md. at 707–08, 426 A.2d 929, quoting Gunther, *The Supreme Court, 1971 Term-Forward: In Search Of Evolving Doctrine On A Changing Court: A Model For A Newer Equal Protection*, 86 Harv.L.Rev. 1, 8 (1972).

Predictably, cases then arose that justified scrutiny exceeding that traditionally applied under the rational basis test but that did not meet the demanding criteria for admission to the strict scrutiny set. These cases, involving

"sensitive although not necessarily suspect criteria of classification," or involving "important" personal interests or "significant interference with liberty or a denial of a benefit vital to the individual," [2] have usually received the critical analysis they deserve, albeit by virtue of diverse judicial rationale utilized to justify the increased scrutiny. This Court has recognized those middle-ground cases as a discrete category for purposes of equal protection analysis, affording "heightened scrutiny" to cases falling within that category, but apparently offering no differentiated approach to cases within a single category. *Hornbeck v. Somerset Co. Bd. of Educ.*, 295 Md. 597, 640–42, 458 A.2d 758 (1983); *Waldron, supra.*

Another approach has been to apply the rational basis test more critically when the facts of a case place it within the upper level of the spectrum of that category. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (White, J., plurality opinion). This approach was promptly labeled a "second order" rational basis review. *City of Cleburne, supra,* 105 S.Ct. at 3263 (Marshall J., concurring in part and dissenting in part). Yet another approach is espoused by Justice Stevens in his concurring opinion in *City of Cleburne,* in which Chief Justice Burger joined.

[O]ur cases have not delineated three—or even one or two—[clearly defined standards of equal protection review]. Rather, our cases reflect a continuum of judgmental responses to differing classifications which have been explained in opinions by terms ranging from "strict scrutiny" at one extreme to "rational basis" at the other. I have never been persuaded that these so called "standards" adequately explain the decisional process. Cases involving classifications based on alienage, illegal residency, illegitimacy, gender, age, or—as in this case—mental retardation, do not fit well into sharply defined classifica-

---

2. L. Tribe, *American Constitutional Law* § 16–31, p. 1090 (1978).

tions. *City of Cleburne, supra,* 105 S.Ct. at 3260–61 (footnotes omitted).

To the extent the dispute is one of substance and not semantics, I am of the opinion that the "continuum" or "full-spectrum" approach most effectively implements the constitutional mandate of equal protection. Utilizing this commendably flexible approach, or even using the "second ·order" rational basis approach, I find the restrictive provision of the statute at issue constitutionally infirm. Difficulty is encountered only when the rigid discipline of the three-tier analysis, complete with the traditional "no-win" rational basis test, is mechanically applied. Even if forced to that analysis, however, I conclude that appropriate consideration of *all* the rights impacted by the statute would justify heightened scrutiny, and so yield the same ultimate result.

I turn to my second point—recognition of the several important rights impacted by the statute. Initially, there is the impact upon judges. An equal protection analysis must address the impact upon the class, but because Judge Hargrove's situation is representative, I shall refer to it.

At the time Judge Hargrove was appointed to the federal trial bench he had accrued more than 16 years of creditable service with the Maryland Judiciary, serving at both levels of the trial courts, and had attained the age of 60 years. He therefore was eligible to retire and receive compensation in the amount of $38,664 per year from the Judicial Pension Plan [3].

This Court has previously held that judicial pensions represent "a form of deferred compensation and not a substitute earnings plan." *Waldron, supra,* 289 Md. at 723, 426 A.2d 929. In *Clark v. Tawes,* 187 Md. 195, 200, 49 A.2d 463 (1946), our predecessors said that judicial pensions are

---

**3.** The Judicial Pension Plan is funded by contributions from the State and from the active judges. Each judge contributes 6% of his or her salary for the first 16 years of service.

part of the inducement which leads competent persons to give up the greater emoluments of private employment for lesser compensation by the State. This is usually stated to be peculiarly applicable to judges who are generally able to make more in private practice than they can on the bench, and who thereby give up all chance of further increase in their estates for a fixed salary which ends when they reach a certain age.

In recommending and in fixing judicial salaries the Judicial Compensation Commission and the Legislature of this State routinely consider the earnings of attorneys and compare those earnings with the *compensation package* of judges, the major components of which are the judge's salary and the State's contribution to the judicial pension fund. No effort is made to establish a judicial compensation package equalling the earnings of comparable private practitioners, for it is always assumed that public service demands a financial sacrifice. But even when a substantial discount is made to accommodate the public service factor, the reduced figure is not paid solely by salary. Instead, it is paid by a combination of salary and the State's contribution to the judges' pension plan.

It is clear that a judge's pension is not a windfall. It is deferred compensation, and is treated as such by the Legislature in fixing judicial salaries. It is fully earned, partially funded by the judges, and one of the reasons highly qualified attorneys are willing to accept judicial positions. The judge who makes the initial financial sacrifice ordinarily involved in the acceptance of a judicial position, who earns his or her compensation package through the required years of service, and who makes the required contributions to the fund, has a significant interest and reasonable expectation of receiving and enjoying, at the time of retirement from state judicial service, that part of the compensation which has been deferred. Curtailment of the right to receive that which has been earned, and for which sacrifices have earlier been made, should be permitted only where

demonstrably required to accommodate legitimate State interests.

Even more important than the private rights of the individual judges are the rights of the people of the State and of the United States to maintain without unnecessary restriction the widest possible pool of highly qualified candidates from which the President may select those who will serve on the United States Supreme Court, the federal Courts of Appeals, and the federal trial courts. A state statute that has a significant chilling effect upon those who by experience, training, and demonstrated ability and temperament may be the most desireable candidates for those important offices should receive careful scrutiny. While not perfect, a useful analogy can be drawn to the ballot access cases.[4] In *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970), the Supreme Court identified the "federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications." In *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the Court, applying the stringent standard of close scrutiny, held that the imposition of an annual poll tax not exceeding $1.50 was a denial of equal protection. In *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), the Court considered a Texas statute that imposed substantial filing fees upon candidates, noting that:

> [T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.... Texas does not place a condition on the exercise of the right to vote, nor does it

---

4. For a discussion of ballot access cases in several contexts, *see* Ahrens & Hauserman, *Fundamental Election Rights: Association, Voting and Candidacy,* 14 Val.U.L.Rev. 465–85 (1980); Note, *Better Late Than Never: The John Anderson Cases and the Constitutionality of Filing Deadlines,* 11 Hofstra L.Rev. 691–732 (1983); Comment, *Municipal Corporations: Extraterritorial Powers Without Voting Rights—Equal Protection Considerations?,* 31 U.Fla.L.Rev. 631–44 (1979).

quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. 405 U.S. 143, 92 S.Ct. at 856 (footnotes omitted).

Acknowledging that not all statutory barriers to candidate access to the ballot will require strict scrutiny, the Court went on to assess the impact of the filing-fee requirement on the exercise of the franchise. Finding that impact "real and appreciable" the Court applied strict scrutiny and invalidated the statute.

The instant case is one step removed from a classic voting rights case. The voters do not directly suffer the restriction of the pool of candidates because, as is typical of a representative democracy, the selection of the persons to fill these important positions is made by a person who has in turn been selected by the voters. However, the ultimate impact upon the people and their government is the same— some of the best qualified candidates are significantly impacted by the legislation. Given the differences that exist between this case and ballot access cases to which I have referred, I am reluctant to urge the application of the strict scrutiny standard here. I believe, however, that the impact upon the public, considered in conjunction with the economic impact upon the involved class of judges and the impact upon their right to be considered as candidates for federal judicial office, justifies a heightened scrutiny, whether denominated as such or as a "second order" rational basis scrutiny. Of course, if the "continuum" or "full-spectrum" sliding scale approach is used, one simply determines how high on the scale the impact is properly placed, and whether there has been shown to exist a state purpose sufficient to justify an impact of that magnitude. Under any of these tests, I believe the restrictive provisions of this statute fail to pass constitutional muster.

The discrimination here is readily apparent. Of all State employees and officials, only judges suffer a setoff of

pension benefits upon acceptance of a federal position. As the parties stipulated:

> By contrast with the Plaintiff, or any other retired judge of the State of Maryland, if the Governor, Lieutenant Governor, Attorney General, or Comptroller, all of whom now are attorneys, were appointed a federal district judge, each would be entitled to collect his full vested pension benefits.

The impact of this restriction has been discussed. There remains for consideration the State purpose served by the statute. The State suggests a threefold purpose: 1) to prevent the appearance of impropriety, 2) to prevent "double-dipping," and 3) to encourage State judges to remain on the bench rather than accept more lucrative public employment. The majority makes no attempt to exalt the importance of these goals. Perhaps that results from the fact that traditionally there has been no need to evaluate the necessity for, or potential efficacy of, legislation being analyzed under the rational basis test—a test more often than not interpreted to mean *any* conceivable basis rather than any conceivable *rational* basis. But it seems to me equally possible that the majority's treatment of the State's proffered purposes may accurately reflect the fact that they deserve a low position on the spectrum of importance.

"Double-dipping," as that term is commonly employed, means receiving a government salary in addition to a pension from the same government. Technically, there is no "double-dipping" when the pension is paid by one sovereign and the salary by another. In a broader context, however, it may be urged that "double-dipping" should include multiple payments from governmental funds, without regard to the identity of the government. The focus should be upon the evil that the State seeks to rectify, and not upon the term used to describe it. Accordingly, the proper inquiry is whether the concurrent receipt by a judge of pension payments from the State and a salary from the federal government is a situation so inimical to the interests of the people

of the State that it justifies the impact we have described and the imposition of the restriction upon judges alone.

As previously discussed, the pension payments to a judge are in reality deferred compensation, and I am not persuaded that the Legislature could rationally conclude that it would in any manner be improper for a judge to collect that which he or she had already earned along with that which the judge was then earning. Had the full compensation package of the judge been paid as salary and had the judge devoted a portion of it to the purchase of a private annuity, it could hardly be said that the judge who later accepted federal employment should not also have the benefit of the annuity. The situation here is the same, except that instead of paying the entire compensation to the judge as salary, the State has paid a portion into a fund, which together with the contributions made by the judge is actuarily sufficient to "purchase the annuity" i.e. to fund the pension payments.

In the alternative, if there can be divined some evil inherent in this process that perhaps my abiding personal interest in the subject causes me to overlook, I nevertheless fail to see why it is wrong for judges to receive the pension, but not wrong for governors, attorneys general, comptrollers and senators to do so. Indeed, given the nature of judicial pensions as heretofore discussed, one would think payments to judges would be the least suspect. This brings me to consideration of another purpose advanced by the State—that judges must avoid the appearance of impropriety. Certainly judges do and should occupy a position of particular trust and confidence in our society, and they are properly held to high standards of conduct. It is not enough to hold that receipt of both payments is entirely ethical and proper, for if the public perception is otherwise the public confidence in the judiciary may in some measure be undermined by allowing the payments. Having identified this as a potential problem that properly may have been considered by the Legislature, I hasten to add that my practical assessment is that its gravity is very low, and

certainly insufficient on balance to justify the substantial impact of the discriminatory statute.

The final reason advanced, that the Legislature may have enacted the restrictive legislation in order to discourage judges from accepting federal employment, seems to me so patently and impermissibly provincial and so contrary to the best interests of a strong federal government as to be unworthy of further comment. To the extent that it could legitimately be given any weight, that weight is too slight, either singularly or when considered with the purpose of avoiding the appearance of impropriety, to justify the substantial impact of the restrictive provisions of the statute.

I would reverse the judgment of the Circuit Court for Baltimore City and remand the case to that Court for entry of a summary declaratory judgment consistent with the views expressed herein.