664 A.2d 1250

**BOARD OF TRUSTEES OF THE MARYLAND STATE
RETIREMENT AND PENSION SYSTEMS**

v.

**Harry R. HUGHES.**

**No. 138 Sept. Term, 1994.**

Court of Appeals of Maryland.

Sept. 19, 1995.

Reconsideration Denied Nov. 3, 1995.

**2**

Carmen M. Shepard, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General; Harriet B. Granet, Carla G. Katzenberg, Assistant Attorneys General, all on brief), Baltimore, for appellant.

John F. X. O'Brien (Glenn E. Bushel, Brocato, Price & Bushel, P.A., all on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, CHASANOW, KARWACKI, BELL and RAKER, JJ., and ROBERT F. FISCHER, Judge, Specially Assigned.

CHASANOW, Judge.

We are called upon in this case to determine whether former Governor Harry Hughes was entitled to receive both his State pension and a State salary while he served as Governor of the State of Maryland. For the reasons discussed below, we hold that former Governor Hughes was not entitled to receive both his State pension and a State salary during his tenure as Governor.

## I.

This appeal arises out of a decision by the Board of Trustees of the Maryland State Retirement and Pension Systems (the Board) holding that the Maryland State Retirement Agency (the Agency) properly suspended former Governor Harry Hughes's (Hughes) retirement benefits during his tenure as Governor. Prior to his election as Governor, Hughes had twenty-two years of State service both as a member of the General Assembly and later as the Secretary of the State Department of Transportation. By virtue of his State service, Hughes earned retirement benefits under the Employees' Retirement System of the State of Maryland (the ERS). Hughes was eligible under Maryland Code (1957, 1988 Repl. Vol.), Article 73B, § 11(12)[1] to receive retirement benefits upon his retirement on June 1, 1977. Section 11(12) provides in pertinent part:

> "[I]f any person, while being a member of the State Employees' Retirement System, has been or may hereafter be

---

1. For purposes of consistency with the administrative decision, we shall refer to the statutes that were in effect at the time of the administrative decision. Thus, unless otherwise specified, all references to § 1 *et seq.* are to Maryland Code (1957, 1988 Repl.Vol.), Article 73B, which was the law in effect at the time of the Agency's decision. Section 11(12) is currently codified in Md.Code (1993, 1994 Repl.Vol.), State Personnel and Pensions Art., § 22–404.

appointed or elected to any State office, or promoted by an express appointment by the appointing authority with the express concurrence of the Secretary of Personnel to any position within the State government which is not a part of the classified service and which is not covered by the provisions of Article 64A ... for a fixed or indefinite term and not be continued in office after serving in such position for a period of one (1) year, reappointed or reelected, provided that the termination of employment was involuntary, except for officials elected or appointed prior to July 22, 1981, as determined by the Secretary of Personnel, after the completion of sixteen years of creditable service, regardless of age, such member may elect, in lieu of the withdrawal of his accumulated contributions, to have such contributions paid to him in an annuity of equivalent actuarial value, in which event he shall also be paid a pension equal to the ordinary disability pension that would have been payable at such time had he been retired on an ordinary disability retirement.... Should such beneficiary be appointed or elected to any office, the salary or compensation of which is paid by the State, his retirement allowance shall cease, and he may again become a member of the retirement system and shall contribute thereafter at the same rate he paid prior to his retirement...."

After Hughes was nominated for Governor in 1978, the Agency wrote Hughes a letter notifying him that if he is elected Governor his retirement allowance would cease under § 11(12). That letter stated:

"As you know, you retired under the provisions of Article 73B, Section 11(12) which reads in part:

'Should such beneficiary be appointed or elected to any office, the salary or compensation of which is paid by the State, his retirement allowance shall cease, and he may again become a member of the retirement system and shall contribute thereafter at the same rate he paid prior to his retirement....'"

Once Hughes was elected and assumed the Governor's office on January 17, 1979 and began to receive a State salary, the Agency suspended payment of his ERS retirement allowance. When Hughes left the office of Governor, the Agency reinstated the retirement benefits Hughes had accrued based on his service as a member of the General Assembly and as Secretary of the Department of Transportation and this pension was paid concurrently with his gubernatorial pension.

In May of 1987, Hughes requested Bennett H. Shaver, then Executive Director of the Agency, to review the appropriateness of the Agency's suspension of his retirement benefits while he served as Governor. Mr. Shaver advised Hughes that the Agency's decision to suspend his retirement benefits was in accordance with applicable law. Hughes wrote another letter to Mr. Shaver contending that because his gubernatorial pension was covered under a different retirement system than the ERS, the retirement benefits he was receiving pursuant to § 11(12) should not have been suspended. Mr. Shaver again informed Hughes that the Agency's decision to suspend his retirement benefits was done in accordance with applicable law. Nevertheless, after Hughes wrote another letter expressing dissatisfaction with the Agency's response, Mr. Shaver wrote a letter to the Attorney General requesting that the Attorney General issue an opinion regarding whether § 11(12) mandated the cessation of Hughes's retirement benefits during his tenure as Governor. The Attorney General issued an opinion which agreed with the Agency's decision to suspend Hughes's retirement benefits while he was serving as Governor. In his opinion, the Attorney General concluded:

> "The provision for suspension of retirement benefits is evidently designed to prevent 'double-dipping'—that is, the simultaneous receipt of retirement benefits and a salary from the State. That policy is similarly embodied in provisions regarding other retirement systems.... As this office observed in connection with a provision that reduces a judge's pension under certain circumstances, 'that policy is not uniquely applied to only one class of retirees. Rather, it

is a policy similarly reflected in other statutes, applicable to other State retirees....'" (Citations omitted).

73 Op.Att'y Gen. 304, 308–09 (1988) (quoting 69 Op.Att'y Gen. 260, 267 (1984)). Approximately three years after the Attorney General's opinion, Hughes requested a hearing on whether the Agency appropriately suspended his retirement benefits during his tenure as Governor. The Agency granted the request for a hearing and the matter was referred to the Office of Administrative Hearings. A hearing was held before Administrative Law Judge Louis N. Hurwitz on May 1, 1992. Following the hearing, the Administrative Law Judge issued a proposed decision which agreed with the opinion of the Attorney General that the Agency appropriately suspended retirement benefits to Hughes while he was serving as Governor. The Administrative Law Judge noted that § 11(12)'s purpose and effect is to prevent a beneficiary from receiving ERS benefits while receiving a State salary and that the General Assembly "carved out no ... exception for Governor Hughes." The Administrative Law Judge concluded that "[w]hile other pensions have been established since the creation of the ERS ..., [n]o law was enacted establishing a separate, distinct and unique pension system [for governors and the gubernatorial retirement plan] cannot be interpreted or misconstrued as being separate and distinct from the ERS." Thus, the judge concluded that the Agency's decision to suspend Hughes's retirement benefits was appropriate. The Board adopted the Administrative Law Judge's recommendation as its final administrative decision.

 Hughes appealed the Board's decision to the Circuit Court for Baltimore City. The circuit court (Byrnes, J.) determined that the issue could not be resolved on the record and remanded the case to the Agency for the taking of additional evidence. Hughes filed a Motion to Alter, Amend and/or Revise Judgment and requested the circuit court to rule in his favor "based on the facts in the record, the legislative history and the agency practice." The circuit court denied the motion and the Agency appealed to the Court of Special Appeals. Prior to the intermediate appellate court's

consideration of this case, we issued a writ of certiorari to consider whether Hughes was entitled to receive both his ERS retirement allowance and a State salary while he served as Governor of the State of Maryland.[2]

## II.

Our task in the instant case is to determine whether the Agency appropriately applied § 11(12) to suspend Hughes's retirement benefits during his tenure as Governor. In interpreting the meaning of a statute, we begin with "the words of the statute, giving them their ordinary and natural import." *Fairbanks v. McCarter*, 330 Md. 39, 46, 622 A.2d 121, 125 (1993). In *Frost v. State*, 336 Md. 125, 647 A.2d 106 (1994), we discussed the considerations involved in construing a statute:

> "In analyzing a statute, we must always be cognizant of the fundamental principle that statutory construction is approached from a ' "commonsensical" ' perspective. Thus, we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense. Furthermore, we do not read statutory language 'in isolation or out of context [but construe it] in light of the legislature's general purpose and in the context of the statute as a whole.' In *GEICO v. Insurance Comm'r*, 332 Md. 124, 630 A.2d 713 (1993), we explained that '[c]ontext may include related statutes, pertinent legislative history and "other material that fairly bears on the fundamental issue of legislative purpose or goal...." ' 332 Md. at 132, 630 A.2d at 717 (quoting *Kaczorowski v. City of Baltimore*, 309 Md. 505, 515, 525 A.2d 628, 632–33 (1987))." (Citations omitted).

*Frost*, 336 Md. at 137–38, 647 A.2d at 112. Additionally, in interpreting a statute, "it may not be necessary to go further

---

2. We note that the circuit court's order remanding this proceeding to the administrative agency for the taking of additional evidence is an appealable final order. *See Schultz v. Pritts*, 291 Md. 1, 6, 432 A.2d 1319, 1322 (1981); *see also Eastern Stainless Steel v. Nicholson*, 306 Md. 492, 501, 510 A.2d 248, 252 (1986). Thus, this case is appropriately before this Court on appeal.

than the scrutiny of statutory language, for the language itself may be sufficiently expressive of the legislative purpose or goal." *Morris v. Prince George's County,* 319 Md. 597, 603, 573 A.2d 1346, 1349 (1990).

Further, when reviewing an agency's interpretation of a statute, we have held that, "[a]lthough never binding upon the courts, the contemporaneous interpretation of a statute by the agency charged with its administration is entitled to great deference, especially when the interpretation has been applied consistently and for a long period of time." *Balto. Gas & Elec. v. Public Serv. Comm'n,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986); *see also* 2B Norman J. Singer, *Sutherland Statutory Construction* § 49.05, at 17 (5th ed. 1992). Bearing in mind these principles, we believe that the Agency's interpretation of § 11(12) follows a logical and common sense approach to the language of the statute and hold that the Agency correctly determined that Hughes's ERS retirement benefits were properly suspended during Hughes's tenure as Governor.

At the time of Hughes's retirement on June 1, 1977, he began receiving a retirement annuity pursuant to § 11(12). When an individual receives a retirement allowance under § 11(12), that section places a limitation on that individual's continuing eligibility to receive his or her retirement benefits. The limitation enumerated in § 11(12) provides that "[s]hould such beneficiary be appointed or elected to any office, the salary or compensation of which is paid by the State, his retirement allowance shall cease...." Given that Hughes was an ERS beneficiary, which is defined as "any person in receipt of a pension, an annuity, a retirement allowance, or other benefits as provided by this article," *see* § 1(11); that he was an elected or appointed official; and that his gubernatorial compensation was paid by the State, it appears that, based upon the plain language of § 11(12), the statute mandated that Hughes's retirement benefits be suspended while he received a State salary during his tenure as Governor.

In support of his argument that his retirement benefits were improperly suspended, Hughes contends that the prohibition contained in § 11(12) against receiving an ERS pension while receiving a State salary would be applicable to him only if he were both a beneficiary *and* a member of the ERS. He argues that upon assuming the office of Governor he became a member of the Gubernatorial Retirement Plan (GRP), and was no longer a member of the ERS. Thus, he contends that he was not subject to the § 11(12) prohibition against receiving an ERS retirement while receiving a State salary. We disagree. Although the circuit court determined that additional information was necessary to determine whether Hughes was an ERS "member" after he assumed the office of Governor, under the plain language of § 11(12) it is immaterial whether Hughes continued to be a *member* of the ERS after he assumed the office of Governor because the prohibition against receiving an ERS retirement benefit while receiving a State salary depends solely on whether Hughes was a *beneficiary* of the ERS. *See* § 11(12) ("should such *beneficiary* be appointed or elected to any office ... his retirement allowance shall cease") (emphasis added).

■ The definitions of "member" and "beneficiary" are independent of one another. *See* § 1(4) (defining "member") and § 1(11) (defining "beneficiary"). An individual's beneficiary status looks to what benefits were earned in the past and how they will be disbursed, while an individual's membership status looks to what additional benefits will accrue in the future. Section 11(12) does not condition the suspension of retirement benefits on whether the elected or appointed official is a member of the ERS. The prohibition in § 11(12) means what it says—when a beneficiary of an ERS pension is elected or appointed to an office in which the compensation is paid by the State, that beneficiary may not simultaneously receive a State salary and an ERS retirement benefit. Thus, for purposes of the suspension of Hughes's retirement benefits under § 11(12), whether Hughes continued to be a member of the ERS after he assumed the office of Governor is not relevant.

██ Hughes also argues that § 11(12) does not apply to an ERS beneficiary who is subsequently appointed or elected to any state paid office which is covered by a retirement system that is separate from the ERS. He argues that because post–1979 governors receive their retirement benefits pursuant to the GRP as embodied in § 11(19)(b),[3] they belong to a system separate and distinct from the ERS. Thus, he contends that because he was not receiving a retirement allowance from the same system in which he was earning future retirement benefits, he should have been able to receive his § 11(12) ERS pension while receiving his gubernatorial salary. For the reasons discussed below, we agree with the Board that the GRP is not a separate retirement system from the ERS but is merely a retirement plan under that retirement system.

Hughes first argues that governors are not covered under the provisions of the ERS because they are not "employees" under the ERS definition contained in § 1(3). He argues that although the language of § 1(3) does not specifically exclude governors from the definition of "employee," the clear intent of the legislature was to exclude persons covered by separate pension systems from the provisions of the ERS. Thus, he argues that because he was covered under the GRP, he is not subject to the ERS prohibition against receiving a retirement allowance and a State salary under § 11(12). We disagree.

---

3. The gubernatorial retirement plan was originally enacted by Chapter 239 of the Acts of 1971 as Article 73B, § 11(18). It was later renumbered § 11(19) and then later recodified in Md.Code (1993, 1994 Repl.Vol.), State Personnel and Pensions Art. § 22–405. Since the GRP as codified in § 11(19) was the section relied upon by the Board in its decision, we shall refer to that section unless otherwise specified. Section 11(19)(b) provides in pertinent part:

"[R]etirement allowances and benefits for persons serving in the office of Governor after January 17, 1979, and their spouses shall be payable in accordance with this subsection. A person serving in the office of Governor after January 17, 1979, shall be eligible to receive a retirement allowance equal to one third the annual salary received during his last term of office, provided that the Governor has served at least one full term and has attained age 55.... This retirement allowance or pension shall be suspended and not paid during any period when the former Governor is employed by any agency of the State of Maryland."

For purposes of the ERS, the term "employee" for whom compensation is provided for by the State is defined by Art. 73B, § 1(3) to "include any appointed or elected employee of the State." Among those excluded from the definition of employee are those eligible members of "the Teachers' Retirement System of the State of Maryland or of the State Police Retirement System or any judge of the circuit courts, Court of Appeals of Maryland, Court of Special Appeals, and District Courts...." § 1(3).

▮ Hughes argues that the list of those excluded from the definition of employee under § 1(3) is not all-inclusive and thus, simply because governors are not excluded from the definition of "employee" does not mean that governors do not belong to a separate retirement system. He argues that the failure to exclude governors from § 1(3) is merely an oversight on the part of the legislature and the legislature did not intend to include governors under the provisions of the ERS. Nevertheless, the legislature has never seen fit to correct that "oversight" by exempting governors from the definition of employee in § 1(3) even though the GRP has been in effect since 1971. Further, although Hughes argues that the legislature did not exclude governors from § 1(3)'s definition of employee because it would have had the effect of denying all pre–1979 governors and their spouses coverage under the ERS, the legislature could have excluded only post–1979 governors from the definition of employee under the ERS to insure that pre–1979 governors and their spouses would retain their benefits under the ERS. Given that the legislature chose not to exclude governors from the ERS definition of employee but excluded others who belong to separate retirement systems from that definition, it indicates that governors are appointed or elected "employees" under the ERS definition and are thus covered under the provisions of the ERS.

Additional support for the fact that the GRP is not a separate retirement system from the ERS is that the GRP does not exhibit the same characteristics as those retirement systems that are separate from the ERS. In enacting the

GRP, the legislature stated that its purpose was to "change the formula for computing the allowance or pension paid to retired governors and their widows in certain circumstances." *See* Chapter 239 of the Acts of 1971. Thus, the GRP provides for a retirement allowance for governors and their spouses but contains no language indicating that it established a new retirement system. *Id.* In addition, the GRP receives its funding from the ERS and contains no provisions for the administration and management of the plan. *See* 1985 Interim Report to the General Assembly by the Joint Committee on Pensions. In contrast, separately created pension systems normally contain separate statutory provisions for the administration, management and funding of the system. *See, e.g.,* § 156(e) now codified at Md.Code (1993, 1994 Repl.Vol.), State Personnel and Pensions Art., § 25–102 (providing for the management, administration and funding of the Correctional Officers' Retirement System). Hughes argues that there were no provisions established for the management, funding and administration of the GRP because, until at least 1983 when the first post–1979 Governor would be eligible for the pension, there was nothing to manage, fund or administer. Although that may be the case, had the legislature intended to create a separate retirement system, there is no reason why it could not have provided for the management, administration and funding of that system when it enacted the GRP. Thus, the fact that the GRP contains no provisions for management, administration or funding, as other separate retirement systems do, further evidences that the legislature did not intend it to be a separate retirement system from the ERS. *See also* 1985 Interim Report to the General Assembly by the Joint Committee on Pensions (including the GRP as part of the ERS and noting that "[t]here is a combined accumulation fund for all of the foregoing plans except Judges'...." and that each of the other listed retirement systems contains its own accumulation funds).

Additionally, the GRP has never been codified as a separate retirement system. When the GRP was enacted, it was codified as subsection (18) under § 11 which established the

general benefit provisions for members of the ERS. The retirement systems which were separate from the ERS, however, were codified under separate provisions in Article 73B. *See, e.g.,* Pensions of Judges and Their Surviving Spouses, §§ 55–63A; Correctional Officers' Retirement System, § 156.

Hughes relies heavily on the fact that the Governor's Salary Commission extensively studied the Governor's salary and recommended that the GRP be a separate retirement system from the ERS. In that regard, Hughes cites the Minutes of a meeting of the Governor's Salary Commission on December 15, 1977 which state:

> "[T]he Commission dropped its recommendation that the plan be tied to the Employee Retirement System ... proposing instead ... that there be a separate gubernatorial retirement plan...."

*See* Governor's Salary Commission Minutes (Dec. 15, 1977). Although the Salary Commission made such a recommendation, the ultimate legislation that became the GRP does not contain any indicia that the legislature intended to create a separate retirement system. While pertinent legislative history may properly be considered, in the instant case, the fact that the Governor's Salary Commission recommended that the GRP be a separate retirement system is not persuasive in light of the specific language of the GRP which never states or even intimates that the GRP is a separate retirement system. We agree with the Board's decision that while "[i]t is true that the GRP is not comparable with other plans within the ERS ... because it is non-contributory, and the benefits and determination of eligibility are distinctly dissimilar. The differences do not have the effect of placing the GRP in a separate system." Thus, we find that the GRP is not a separate retirement system from the ERS.

Hughes further argues that he was entitled to continue to receive his ERS pension while serving as Governor because retirees of other State pension plans may obtain reemployment with the State and continue to receive their pensions. We initially note that our cases have held that pension provi-

sions established for different groups of State employees need not be uniform. *Hargrove v. Board of Trustees,* 310 Md. 406, 424, 529 A.2d 1372, 1381 (1987) (noting that "not all variances among different pension systems need be justified by the State"), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988); *Clark v. Tawes,* 187 Md. 195, 200, 49 A.2d 463, 465 (1946) (stating that "[t]he class of statutes usually known as retirement acts which provide pensions for different classes of State employees need not be alike as to all employees"). In noting the difference in pension plans in *Hargrove,* we observed that "retired judges may accept permanent post-retirement employment at the state and local level, subject only to an offset, while other retired state employees will lose their pension benefit if they accept certain such permanent employment." 310 Md. at 424–25, 529 A.2d at 1381.

Some retirement systems that are separate from the ERS have provisions which permit retirees to obtain some types of reemployment with the State without forfeiting their entire retirement benefits while receiving a State salary. *See, e.g.,* § 86(9)(a) (containing the conditions upon which retired members of the Teachers' Retirement System may secure State employment without forfeiting their retirement benefits while employed); § 56(c)(1) (containing the conditions upon which retired judges may accept State employment without forfeiting their retirement benefits while employed). In contrast, § 11(19)(b) provides that a "retirement allowance or pension shall be suspended and not paid during any period when the former Governor is employed by any agency of the State of Maryland." Additionally, § 11(12) of the ERS, under which Hughes retired, specifically provides that a beneficiary's retirement allowance *shall cease* if that beneficiary is appointed or elected to an office in which the salary is paid by the State. Thus, although retirees of other pension plans may secure some type of reemployment with the State and continue to receive a retirement allowance, retirees under § 11(12) who are subject to the limitation on the receipt of retirement

benefits may not do so.[4]

Finally, Hughes argues that ERS retirees who subsequently become judges have apparently been permitted to continue to receive their ERS benefits while receiving a judicial salary. Thus, he argues that because a judge, as well as a governor, is an elected or appointed official receiving a State salary, Hughes also should have been able to collect his ERS retirement benefit while receiving his gubernatorial salary. The Attorney General's opinion discussing the appropriateness of suspending Hughes's retirement benefits apparently assumed that ERS retirees who become judges are permitted to continue to receive their ERS pension along with their judicial salary. *See* 73 Op.Att'y Gen. 304, 306–07 (1988). The Attorney General states that because a judge is specifically excluded from the ERS definition of "employee" under § 1(3), "a judge's continued receipt of a retirement allowance from the ERS does not create a situation in which an employee is receiving a retirement allowance from a system in which he or she is simultaneously earning entitlement to additional retirement benefits to be paid in the future." *Id.* The Attorney General's rationale, however, does not address how an ERS beneficiary, even if that beneficiary is not an "employee" as defined in § 1(3), may escape the specific prohibition in § 11(12) if he or she becomes an elected or appointed official whose salary is paid by the State. Under the plain language of § 11(12), the cessation of retirement benefits does not depend upon whether the person who retired from the ERS is

---

4. We note that even those retirement systems which permit some type of reemployment by the State without forfeiting retirement benefits provide that the retirement benefits are generally offset by the amount of the State salary. *See, e.g.,* § 86(9) (providing that the State salary and the retirement benefits "shall not exceed in amount the average final compensation upon which such retirement allowance was based ..."); § 56(c)(1) (providing that the State salary and the retirement benefits "may not exceed in amount the compensation upon which the retirement allowance is based ..."). Thus, although some retirement systems allow a retiree to continue to collect retirement benefits upon the retiree's reemployment with the State, generally the retirement plans do not permit the type of "double dipping" Hughes requests, i.e. receiving a full State salary while receiving a full retirement pension.

earning additional retirement benefits in that system. Pursuant to § 11(12), the suspension of retirement benefits is mandatory if the elected or appointed official is an ERS beneficiary who is receiving a State salary.

Hughes claims that the aim of § 11(12)'s prohibition on receiving an ERS retirement allowance and a State salary "is to prevent an elected official from receiving benefits from the ERS during the same period ... he was a member of and earning a second pension from the ERS." We believe the statute clearly expresses a broader purpose. As we previously stated, because § 11(12) does not condition the cessation of retirement benefits on an individual's membership status in the ERS, the aim of the statute is not merely to prevent an ERS beneficiary from receiving a retirement allowance if that beneficiary is earning a second pension from the ERS but is rather to prevent State funds from being utilized to pay both an ERS pension and a State salary. Although at the time of the Agency's decision, there was "no set policy regarding the receipt of a pension and a salary simultaneously," *see* 1980 Interim Report to the Maryland General Assembly of the Joint Committee on Pensions, we find that, as the circuit court noted, the State of Maryland has generally indicated an "intent that 'double-dipping' be discouraged." In fact, the "double-dipping" prohibition enumerated in § 11(12) is also embodied in other retirement plans. *See generally* 73 Op. Att'y Gen. at 308–09. Although the circuit court held that the Board failed to take into proper consideration "[a] legislative history which reveals that ... there was no effective, consistent *de facto* double-dipping prohibition," the legislative history does not contradict the plain meaning of § 11(12) which prohibits retirees under that section from receiving their retirement allowance while receiving a State salary.

### III.

In conclusion, we hold that the Board's determination that § 11(12) prohibited Hughes from collecting his retirement allowance during his tenure as Governor was correct. Be-

cause we hold that Hughes's retirement benefits were appropriately suspended while he was receiving a State salary during his tenure as Governor, we need not consider whether Hughes is entitled to interest on those suspended payments.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE BOARD OF TRUSTEES OF THE MARYLAND STATE RETIREMENT AND PENSION SYSTEMS.*

BELL, Judge, dissenting, in which FISCHER, Judge, joins.

I do not share the majority's opinion that former Governor Hughes was properly denied his State pension during his tenure as Governor. Indeed, it is my considered judgment that the legislative scheme under review makes perfectly clear that, during that time, he was entitled to receive both his State pension and his State salary. Therefore, I dissent.

It is the application of Maryland Code (1957, 1978 Repl. Vol.), Art. 73B, § 11(12) that is at the heart of this case [1], as there are few, if any, disputed facts. Section 11(12) provides in pertinent part:

> Should such beneficiary be appointed or elected to any office, the salary or compensation of which is paid by the State, his retirement allowance shall cease, and he may again become a member of the retirement system and shall contribute thereafter at the same rate he paid prior to his retirement. . . .

I agree with the majority that the issue in this case is one of statutory interpretation. Nor is there much disagreement between the majority and myself as to the process by which that issue is to be resolved.

It is well settled that the search for legislative intent begins with, and ordinarily ends with, the words of the statute, *City of Baltimore v. Cassidy*, 338 Md. 88, 93, 656 A.2d 757, 760

---

1. Presently codified at Maryland Code (1993, 1994 Repl.Vol.), State Personnel and Pensions Article, § 22–404.

(1995); *Harris v. State,* 331 Md. 137, 145, 626 A.2d 946, 950 (1993), considered in light of their plain and ordinary meaning. *Dickerson v. State,* 324 Md. 163, 170–71, 596 A.2d 648, 651–52 (1991). An exception to this canon of statutory interpretation, however, is that when the language of the statute is clear and unambiguous, the result achieved by applying the plain language may be confirmed by the use of extraneous interpretive aids, such as legislative purpose, history, context, etc. *State v. Thompson,* 332 Md. 1, 7, 629 A.2d 731, 734 (1993). When the words of the statute are not clear—the statute is ambiguous— those interpretive aids inform the meaning of the enactment as well as the search for the Legislature's real intention. In that regard, in addition to considering context, which "may include related statutes, pertinent legislative history and 'other material that fairly bears on the ... fundamental issue of legislative purpose or goal ...,' " *GEICO v. Insurance Commissioner,* 332 Md. 124, 132, 630 A.2d 713, 717 (1993) (quoting *Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 632–33 (1987)), we must endeavor to avoid giving a statute a nonsensical, illogical or unreasonable construction, a point that the majority also recognizes. 340 Md. at 7, 664 A.2d at 1253 (quoting *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106, 112 (1994)). But the statute under review also must be read so that no word or portion thereof is rendered surplusage, superfluous, nugatory or insignificant.[2] *GEICO,* 332 ·Md. at 132, 630 A.2d at 717.

The relevant portion of § 11(12), to be sure, does provide for, as the majority posits, the cessation of retirement payments to a beneficiary upon that beneficiary's being elected or appointed to an office, the salary of which is paid by the State. It goes further than that, however. It also, quite clearly,

---

**2.** To be sure, it is appropriate to consider the contemporaneous interpretation given a statute by the agency charged with its administration. *Baltimore Gas & Electric v. Public Service Commission,* 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986); *see Embrey v. Motor Vehicle Administration,* 339 Md. 691, 699 n. 10, 664 A.2d 911, 915 n. 10 (1995). What weight to give that interpretation, however, depends upon its persuasiveness and, at bottom, whether it is correct. In this case, the appellant's interpretation is simply wrong.

contemplates that the beneficiary be able once again to become a member of the Employee's Retirement System ("ERS") and thereby enhance those *same* retirement benefits. Section 11(12) does not, in express terms, specifically condition the cessation of retirement payments on the beneficiary's membership, potential or actual, in the ERS. That absence, however, is a function of draftsmanship. Section 11(12), considered in its entirety, does present the issue of whether actual or potential membership is a condition precedent to cessation of retirement benefits. Hence, the provision is at best ambiguous. It is necessary, therefore, to look to interpretative aids, other than the words the Legislature used, to find the answer.

The majority concludes, without reference to membership status, that § 11(12) is clear and unambiguous and requires cessation of retirement payments whenever a beneficiary of the ERS is elected or appointed to State office. That conclusion disregards the conjunctive phrase, "and he may again become a member of the retirement system and shall contribute thereafter at the same rate he paid prior to his retirement." That phrase addresses renewal of ERS membership and its effect, *i.e.* an enhanced pension at the conclusion of the elective or appointed service; nevertheless, the majority fails to give it any effect.

I suspect that it was by reference to that conjunctive phrase that the Attorney General concluded, in his 1988 opinion, *see* 73 Op.Att'y Gen. at 306–07, that a beneficiary of the ERS who becomes a judge is entitled to receive both the pension benefits and the judge's salary, the latter of which, is, like the Governor's salary, payable by the State. Taking the conjunctive phrase into consideration, the Attorney General opined that the beneficiary's status as an employee for purposes of the ERS is critical. While I do not agree with the Attorney General's analysis of the appellee's situation, it at least takes into account every aspect of the relevant statutory provision.

By Chapter 239 of the Acts of 1971, the Legislature enacted the Gubernatorial Retirement Plan ("GRP"). Captioned as

"Governor and Surviving Spouse of Governor" and codified under § 11, "Benefits; Maryland Employees Retirement Review Board," as subsection (18) (later renumbered as subsection (19)), it provides, as relevant:

\* \* \* \* \* \*

> (b) Notwithstanding anything to the contrary in any other law, retirement allowances and benefits for persons serving in the office of Governor after January 17, 1979, and their spouses shall be payable in accordance with this subsection. A person serving in the office of Governor after January 17, 1979, shall be eligible to receive a retirement allowance equal to one-third the annual salary received during his last term of office, provided that the Governor has served at least one full term and has attained age 55. The retirement allowance so determined shall continue for the life of the retiree. This retirement allowance or pension shall be suspended and not paid during any period when the former Governor is employed by any agency of the State of Maryland.

Section 11(12) was a part of the Maryland law long before subsection (19) was enacted. Prior to 1971, therefore, Governors were members of the ERS. Consequently, and not unexpectedly, a Governor's retirement allowances and benefits were funded, and paid, pursuant to its provisions. There simply was no other pension system in which Governors belonged or from which their pensions were to be paid.

Accordingly, in 1971, an ERS beneficiary elected Governor necessarily would have had to look to the ERS for any retirement benefits he would receive as a result of that service. There was no other pension or source for such a pension. Thus, § 11(12) clearly would have applied and, pursuant to its requirements: the pension benefits would have ceased and the beneficiary would be required to elect whether once again to become a member of the ERS; if he chose to renew ERS membership, the pension payable at the end of the beneficiary's term as Governor would have been enhanced.

A different scenario obtained after 1979. An ERS beneficiary elected Governor after 1979 could not renew his or her membership in the ERS and, thereby, enhance his or her pension, even if he or she were of a mind to do so. Instead, as prescribed by § 11(19), the beneficiary automatically became a member of the GRP, from which he or she would be paid retirement benefits upon the completion of his or her term as Governor. Accordingly, beginning in 1979, an ERS beneficiary who served as Governor would have received, in respect of his or her service as Governor, a pension which was not dependent upon membership or potential membership in the ERS.[3]

I agree with the appellee, whether his retirement benefits were improperly suspended does not depend solely upon whether he was a present beneficiary of the ERS. Rather, it depends as much upon whether he is, or potentially is, a member of that system from the standpoint of accruing additional pension benefits. Stated differently, what is critical is whether the ERS will be looked to for pension payments in respect to the State employment—the appointed or elected office—in which the beneficiary is presently engaged. Thus, while I do not agree with the appellee that it is the beneficiary's membership in the ERS that causes the pension payments to cease, read in its entirety, § 11(12) ties cessation of ERS pension payments to whether a present ERS beneficiary's occupation of an elected or appointive office would qualify him or her for enhanced pension benefits from the ERS. Therefore, although the appellee need not have been a mem-

---

3. The majority suggests that the GRP is merely a "plan" within the overall Employees Retirement System. The majority does not explain the difference between a system and a plan. In that regard, Black's Law Dictionary defines "plan" as, among others, "a method of design or action, procedure, or arrangement for accomplishment of a particular act or object. Method of putting into effect an intention or proposal." (Citation omitted) Black's Law Dictionary 1150 (6th ed. 1990). That source defines "system" as "[o]rderly combination or arrangement, as of particulars, parts, or elements into a whole; especially such combination according to some rational principle. Any methodic arrangement of parts. Method; manner; mode." *Id.* at 1450.

ber of the ERS at the time that he became Governor, it was necessary that, because of that position and the pension it would generate, he could have been. In this case, the appellee could not have renewed his membership in the ERS, the Legislature having previously enacted legislation creating the GRP and prescribing its membership and the benefits to which its members are entitled.

I think it is patent that it was perfectly proper for the appellee to have received both his ERS retirement payments and his State salary as Governor. The pension benefits the appellee accrued as Governor[4] will be paid from a different pot than the pension payments received from the ERS.

My reading of § 11(12) is confirmed by looking at it in its historical context. Before 1971, when the Legislature enacted the GRP, there was neither a State policy against "double dipping" nor a general prohibition against a pensioner receiving both a pension and a salary from the State at the same time. The record at the administrative hearing confirms that this was so. This lack of policy was also confirmed by Legislative action taken during the 1972 session.

Spurred by the reality that, under the law as then written, anyone could receive a salary for full time State employment and, at the same time, draw a State pension for former employment, the Legislative Council proposed Bill No. 368(1). That bill would have prohibited that occurrence and, at the same time, authorized a single payee to receive payments from two separate pensions, so long as the service forming the basis for each was rendered at different times. To accomplish the former result, Bill 368(1) was introduced in the 1972 General Assembly as Senate Bill 34. As proposed it provided:

---

4. At the risk of restating the obvious, it should, nevertheless, be noted that a pension "is not a windfall." *Hargrove v. Board of Trustees*, 310 Md. 406, 431, 529 A.2d 1372, 1384 (1987) (McAuliffe, J., dissenting) (discussing judicial pensions), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 753, 98 L.Ed.2d 766 (1988). Rather, a pension " 'is a form of deferred compensation which is attributable to the entire period in which it was accumulated.' " *Kuchta v. Kuchta*, 636 S.W.2d 663 (Mo.1982) (en banc) (quoting *Shill v. Shill*, 100 Idaho 433, 599 P.2d 1004 (1979)).

During any period a person is receiving compensation as either an employee or an elected or appointed official, *whether or not he is a member of the Retirement System,* he is not entitled to receive any pension or retirement allowance supported wholly or in part by the State of Maryland, except benefits from Social Security; (Emphasis added).

Senate Bill 34 was not enacted as proposed. *See* Chapter 382 of the Acts of 1972. It was amended to delete the "double dipping" provision, the above quoted language. It was also amended in tone, from prohibitory to enabling legislation. As passed, it provided:

At the time of retirement as a judge in one of the listed courts, the member is eligible to receive benefits from both the Retirement System and the Judges' Pension System. Upon retirement, no salaried State employee, judge, legislator, or Executive official may receive benefits under more than one pension system for the same period of service.

*See* § 3(2)(e). Coupled with the repeal and reenactment of §§ 3(1)[5] and 3(5),[6] Chapter 382, Acts of 1972 permitted one person to receive benefits under more than one pension, provided they did not cover the same period of service. Indeed, the purpose of the statute, as passed, was "to enable a person with separate years of service in two State-supported pension systems, upon retirement, to receive the benefits to

---

5. That section provided before repeal and reenactment:

Any person who shall become an employee as herein defined after the date of establishment may become a member of the Retirement System ..., *and shall not be entitled to receive any pension or retirement allowance from any other Retirement System if that pension or retirement allowance is supported wholly or in part by the State of Maryland, anything to the contrary notwithstanding, except benefits from Social Security.* (Emphasis added).

The italicized portion was deleted upon reenactment.

6. That section provided before repeal and reenactment:

If any such official is entitled to a pension or retirement allowance under the provisions of any other law, and such pension or retirement allowance is supported wholly or in part by the State of Maryland, except benefits from Social Security, such official shall be deemed to have waived the benefits thereof by accepting the payment of benefits under this article.

which he is entitled under both systems." Chapter 382 of the Acts of 1972. Contrary to the Attorney General's Opinion issued in 1988, *see* 73 Op.Att'y Gen. 304, 308–09, therefore, at that time, no such policy against "double dipping" was evident in the pension law. On the contrary, the Legislature rejected an effort to institute just such a policy. Instead, as noted, it recognized, that under certain circumstances, double payments from separate state-supported pensions are permissible.

Because there was no policy, in 1972, against the receipt of both a State salary and a State pension, as the Legislative Council recognized, it then was possible for a State employee drawing a pension under the ERS to obtain employment covered by a different pension program and receive the benefits of both, *i.e.* a salary and, later, a pension from the employment. Thus, the State generally agrees, for example, that because judicial pensions are governed by a separate pension system, a beneficiary of the ERS who becomes a judge may receive both a judicial salary, payable by the State, and the ERS pension; the pension payments continue despite the employee's continued employment with the State of Maryland. The decisive factor is not whether the pension and salary the beneficiary is receiving are, respectively, State-supported and funded, but rather whether the pension pursuant to which the retirement benefits are being made is separate from the one in which the beneficiary is earning future pension benefits.

The majority denies that the GRP is a separate pension system. Although it acknowledges that the GRP " 'is not comparable with other plans within the ERS ... because it is non-contributory, and the benefits and determination of eligibility are distinctly dissimilar,' " it asserts that those differences do not render it separate and apart from the ERS. 340 Md. at 13, 664 A.2d at 1256 (quoting from the Board's decision). In addition, the majority finds it significant that, rather than placing the GRP provisions in a section of the statute not addressing the ERS, the Legislature chose to place them in § 11, a section dealing generally with the ERS benefits. It also notes the lack of provisions providing for funding separate

from the ERS and the fact that the GRP is administered by the ERS, and that "the specific language of the GRP ... never states or even intimates that the GRP is a separate retirement system." 340 Md. at 13, 664 A.2d at 1256.

The Governor's Salary Commission proposed the establishment of a *separate* retirement plan for Governors, rather than one that was tied to the ERS. Consistent with that approach, Chapter 239 of the Acts of 1971 was enacted. It prescribed, as the majority concedes, a plan with dissimilar eligibility and benefit criteria: only one term had to be served as Governor; it was non-contributory; and it was payable at age 55 at the rate of one-third of the Governor's salary. It was unnecessary, in my view, that the Legislature use explicit language indicating its intention to establish a separate system. The mere fact of enactment of the GRP is, I believe, sufficient evidence of that intention. Furthermore, the majority's reasoning with respect to the funding or administration of the plan is not persuasive. Because it is non-contributory and its coverage so narrow, it was not necessary either to provide for contributions or to prescribe detailed eligibility requirements. The only contributions required are those from the State and it is that source of funds, the State as employer, not the ERS, from which the benefits are paid.

That there is no provision made in § 11(19) for the administration and management of the GRP does not render the GRP a part of the ERS, rather than a separate, discrete plan for Governors. Indeed, § 13, "Management of funds," made clear that "[t]he board of trustees shall be the trustees of the several funds created by this article ... and shall have full power to invest and reinvest such funds...." *See* also Maryland Code (1993, 1994 Repl.Vol.) § 21–123 of the State Personnel and Pensions Article (placing responsibility for managing assets of the several systems under the supervision of the Board of Trustees of the State Retirement Pension System). Thus, for example, the provisions of Art. 73B pertaining to judicial retirements and pensions do not address administration and management of that pension fund; there are no

special provisions in §§ 55–63A for the separate administration and management of the judicial pension. Even though the Correctional Officers' Retirement System, and perhaps others, may now be handled differently does not in any way undermine the logic or the persuasiveness of the appellee's position. The Legislature certainly could have provided for separate management and administration for the GRP. It was not required to do so, however.

The majority asserts that, because Governors, as a class, were not excluded from the definition of "employee" in § 1(3), the Legislature must have intended that Governors be included within the class of appointed or elected "employees" "under the ERS definition and are thus covered under the provisions of the ERS." 340 Md. at 11, 664 A.2d at 1255. I do not agree. While I concede that a Governor may fall within the definition of employee under the ERS, that does not mean that a Governor *necessarily* is a member or is covered under the provisions of the ERS. What the nonexclusion does mean is that, but for some other provision, a Governor would be covered. In this case, there is a provision, *i.e.,* § 11(19), that effectively excludes Governors; indeed, it precludes even those who might wish to be members, from becoming members of the ERS. Thus, no matter how comfortably the definition of employee may apply to one who occupies the office of governor, § 1(3) does not, in light of § 11(19), mandate that Governors be covered by the ERS.

Having concluded that the appellee was entitled to receive his ERS benefits while receiving his salary as Governor, I would affirm the judgment of the Circuit Court for Baltimore City remanding the case to the ALJ. The purpose of the remand would be to allow the ALJ to consider, in the first instance, the amount of interest to which the appellee is entitled.

FISCHER, J., joins in this opinion.